UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

L.A. INSURANCE AGENCY
FRANCHISING, LLC,

                    Plaintiff,                    Civil Action No. 14-14432
                                                 Magistrate Judge David R. Grand

v.

CLAUDIA MONTES, et al.,

                    Defendants.
_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR LEAVE TO AMEND COUNTERCLAIMS [35]; AND MOTION FOR LEAVE TO SUPPLEMENT COUNTERCLAIMS [36]

Before the Court in this franchise dispute are motions for leave to amend and supplement counterclaims filed by franchisees/defendants L.A. Insurance Agencies NV 12, LLC, NV 15, LLC, NV 17, LLC, and NV 26 LLC and their owner, defendant Claudia Montes (collectively "defendants"). [35, 36].  Plaintiff/franchisor L.A. Insurance Agency Franchising, LLC ("L.A. Insurance") filed a consolidated response to both of the motions. [47].  Defendants filed a reply. [50].  The Court held a hearing regarding the above motions on November 3, 2015 [77], after which L.A. Insurance filed a supplemental brief [78] and defendants filed a response. [93].

The parties consented to this Court conducting all proceedings in this action, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [29].

## I.    BACKGROUND

According to L.A. Insurance, this case stems from Montes's decision, in August 2014, to unilaterally terminate at least one of her L.A. Insurance franchises located in the Las Vegas, Nevada area and open a competing insurance agency within the geographic area prohibited by

her franchise agreements.  [68 at ¶¶ 18-19].  Montes has a different view of the dispute's origin; she alleges that L.A. Insurance fraudulently and/or through duress, induced her into signing the parties' various franchise agreements, and that L.A. Insurance breached its obligations under those agreements long before Montes engaged in the breach alleged by L.A. Insurance.  A brief discussion of the factual background of the parties' relationship is helpful to understanding the dispute and the Court's resolution of the instant motions.

Montes alleges that she first "originated" an insurance agency as a franchise of L.A. Insurance in 2006, entering into a franchise agreement with L.A. Insurance and opening her NV12 franchise.  [35-1 at ¶¶ 4, 14-15].  She claims that L.A. Insurance made a number of misrepresentations to her at the time to induce her to open that franchise, including that: (1) "[L.A. Insurance] had negotiated better than market commission rates with the carriers that [L.A. Insurance] worked with, thereby enabling franchisee's [sic] to make more money as a franchisee of [L.A. Insurance] then as an independent insurance agency"; (2) "while [L.A. Insurance's] franchise agreement only permitted franchisees to write policies for 'authorized carriers,' [] [L.A. Insurance] had dozens of authorized carriers and would be adding over one hundred authorized carriers to its approved list"; (3) "[L.A. Insurance had an aggressive marketing and advertising arm that would provide comprehensive marketing support in the Southern Nevada market…"; and (4) "L.A. Insurance's] franchise system offered a comprehensive system of support and assistance that made operating its franchises relatively easy, straightforward, simple, and vastly superior and more successful than owning and operating an independent insurance agency."  [*Id.* at ¶¶ 6, 8, 10, 12].  Montes claims that she later learned that each of these representations was false when made.  [*Id.* at ¶¶ 7, 9, 11, 13].  More specifically, she claims that: (1) "the commission rates offered by [L.A. Insurance] were significantly worse than the rates that

one would earn as an independent insurance agency"; (2) "[L.A. Insurance's] list of 'authorized' carriers was actually limited to only a small, handful of insurance providers"; (3) "[L.A. Insurance] had failed to allocate any material resources to marketing or otherwise advertising its franchised businesses within the Southern Nevada market"; and (4) "[L.A. Insurance] offered no support at all to its franchises, not even offering [Montes] a handbook of operating procedures to review." [*Id.* at ¶¶ 7, 9, 11, 13].

In 2007, Montes organized a second L.A. Insurance franchise (by purchasing an existing franchise) – NV15. [*Id.* at ¶ 18]. In 2009, Montes founded a third L.A. Insurance franchise – LA Insurance NV20, LLC ("NV20"). [*Id.* at ¶ 20].[1]

Montes alleges that in 2010, L.A. Insurance "sought to force [her] [] to execute a new, revised franchise agreement (hereafter referred to as the 'Revised Franchise Agreement')" for her existing franchises. [*Id.* at ¶ 26].[2] Montes claims the Revised Franchise Agreement was "longer and considerably more onerous than the agreement that [she] had originally agreed to." [*Id.* at ¶ 27]. More importantly, Montes alleges that "[L.A. Insurance] offered no consideration for the substantially altered terms presented in the Revised Franchise Agreement, instead merely threatening that [it] would somehow take away all of [Montes'] existing businesses if she failed to sign the Revised Franchise Agreement." [*Id.* at ¶ 28]. Montes characterizes the Revised Franchise Agreement as "a 'take it or leave it' contracts [sic] of adhesion with several procedurally and substantively unconscionable provisions, including, but not limited to (1)

---

[1] Montes alleges that L.A. Insurance asked her to rebrand NV20 as it was too close to another L.A. Insurance franchisee. [*Id.* at ¶¶ 21-22]. Montes rebranded NV20 as Montes Services LLC, and claims that L.A. Insurance still receives residual commissions from carriers that wrote business under NV20. [*Id.* at ¶ 25].

[2] According to documentation provided by L.A. Insurance, this seems to have occurred in 2009, not 2010. [78 at 3].

lopsided non-compete provisions; (2) unfair choice of law and jurisdiction provisions stating that any issues arising out of the Franchise Agreements contract are governed by Michigan law; and (3) multiple grounds allowing [L.A. Insurance] to declare [defendants] in default without a right to cure, while [L.A. Insurance] has the right to cure in all scenarios." [*Id.* at ¶ 29].

In 2011, Montes purchased another franchise from L.A. Insurance, placing the business under NV17, and also originated yet another L.A. Insurance franchise – NV26. [*Id.* at ¶¶ 30, 32].

Montes alleges that on August 10, 2011, L.A. Insurance, without her permission, forged her signature to an agency agreement and a producer agreement with Primero Insurance Company, purportedly entered into on behalf of NV26. [*Id.* at ¶¶ 33-34]. Montes alleges that but for the forgery, she could have negotiated better terms with Primero. [*Id.* at ¶ 35]. Montes also alleges that L.A. Insurance forged her signature on other documents. [*Id.* at ¶ 36].

Montes claims that in 2013, she "became increasingly aware of the fact that the franchise system offered by [L.A. Insurance] was nothing more than a hoax. L.A Insurance offered nothing of value to its franchisees, but instead siphoned money off of what were essentially small, independent businesses." [*Id.* at ¶¶ 40-41].

Montes alleges that in October 2013, L.A Insurance opened eight insurance agencies – Toro Insurance Agency NV1-NV8 – with Toro NV6 opening "just across the street from NV26…]" [*Id.* at ¶¶ 43, 45]. Montes complained to L.A. Insurance about this alleged "direct competition" by it against its own franchise, but to no avail. [*Id.* at ¶¶47-48].

Montes claims that by opening these competing insurance agencies, L.A. Insurance frustrated the purposes of the original and Revised Franchise Agreements with Montes and her

L.A. Insurance franchises.  [*Id.* at ¶ 53].  Montes claims that L.A. Insurance's opening of Toro NV6 caused her to close her NV26 agency.  [*Id.* at ¶ 55].

Montes' closing of NV26 and opening of a new insurance agency within the geographic area proscribed by the franchise agreement's non-compete provision led L.A. Insurance to file its initial complaint in this action against defendants in November 2014.  [1].  L.A Insurance has since amended its complaint to allege causes of action against Montes and her franchises for, among other things, breach of contract, federal and common law trademark infringement, and federal and common law unfair competition. [68].  In the interim, defendants filed their answer on March 17, 2015, along with counterclaims for breach of the covenant of good faith and fair dealing, violations of Nevada Revised Statutes 598.0915 (3), (15), and a request for injunctive relief. [22].  Defendants filed the instant motions for leave to amend and leave to supplement their counterclaims on August 17, 2015. [35, 36].

In their proposed amended countercomplaint, defendants essentially allege that their franchise agreements with L.A. Insurance are void and/or unenforceable due to the alleged fraud and/or duress described above, and because the Revised Franchise Agreement is an unconscionable adhesion contract.  Defendants also claim that L.A. Insurance breached those agreements throughout their duration, and that L.A. Insurance violated various laws and rights of the defendants along the way.  Defendants also assert a claim of "fraud in the factum" related to their allegations that L.A. Insurance's representatives forged Montes's signature on various corporate documents.  Specifically, defendants seek leave to add counterclaims for: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); fraud in the factum (Count III); fraud via intentional misrepresentation (Count IV); deceptive trade practices under both Nevada Revised Statute 598.091 (Count V) and Mich. Comp. Laws § 445.903 (Count

VI); breach of fiduciary duty (Count VII); constructive fraud (Count VIII), and unspecified "injunctive relief" (Count XI).[3] [35, Ex. A at ¶¶ 62-68, 74-94, 102-25].

The same day that defendants moved to amend their counterclaims they also filed a motion to supplement those counterclaims. [36]. In that latter motion, defendants allege that L.A. Insurance sent letters to several third-party insurance carriers requesting that they forward all of defendants' commissions to L.A. Insurance's corporate headquarters and cancel defendants' "agent producer codes." [36-1 at ¶¶ 10-22]. Defendants seek to supplement the foregoing proposed counterclaims with additional causes of action for tortious interference with business relations (First Supplemental Counterclaim) and contractual relations (Second Supplemental Counterclaim), and to expand their deceptive trade practices counterclaims under NRS 598.0915 (Third Supplemental Counterclaim) and MCL 445.903 (Fourth Supplemental Counterclaim). [*Id.* at ¶¶ 27-52].

L.A. Insurance counters that it would be futile to allow defendants to either amend or supplement their counterclaims under Fed. R. Civ. P. 15 because: (1) Michigan law does not recognize an independent claim for breach of the covenant of good faith and fair dealing; (2) the counterclaims under NRS 598.0915 are barred by the choice-of-law provision in the franchise agreements; (3) MCL 445.903 does not apply to the purchase or sale of franchises; (4) the fraud and constructive fraud counterclaims are barred by the integration clause in the franchise agreements; (5) the fraud and constructive fraud counterclaims are barred by Michigan's economic loss doctrine; (6) any counterclaims for breach of the original franchise agreements should be dismissed because those agreements were superseded by the 2010 Revised Franchise Agreements; (7) the counterclaims alleging tortious interference with business relations and

---

[3] Defendants' proposed amended counter complaint omits Counts IX and X.

tortious interference with contractual relations lack merit because the underlying allegedly tortious conduct is permitted under the franchise agreements; (8) the counterclaims alleging breach of contract and breach of fiduciary duty are barred under the one-year statute of limitations set forth in the franchise agreements; and (9) the breach of fiduciary duty claim must fail because there is no fiduciary relationship between a franchisor and franchisee, the franchise agreements explicitly disclaimed any fiduciary relationship between L.A. Insurance and defendants, and the alleged tortious conduct is, in fact, permitted under the franchise agreements.

The Court conducted a hearing on the instant motions on November 3, 2015, where the issue of whether L.A. Insurance had provided Montes with copies of the franchise agreements at least 14 days before she signed them as required by law was raised.  The Court also asked L.A. Insurance if it had any case law (it had provided none in its initial response brief) regarding its argument that the integration clause in each of the franchise agreements barred defendants' fraud claims related to oral representations which predated the agreements' execution.  [47 at 17-19]. After oral argument, L.A. Insurance submitted a supplemental brief addressing these issues and additionally arguing that: the franchise agreements are not adhesion contracts; the principle of mutuality of obligation need not apply to every distinct provision in the franchise agreements; and defendants cannot challenge the non-exclusivity clause in each of the franchise agreements (which L.A Insurance contends permits it to open competing insurance agencies anywhere – even next to its own franchises – notwithstanding that franchisees may not open a competing business within a defined geographic area) on the ground that those provisions violate the covenant of good faith and fair dealing.  L.A. Insurance also appended four signed "receipts" to the supplemental brief, along with the dated signature pages for each of the franchise agreements, which purportedly show that Montes signed the agreements at least 14 days prior to

their execution, and therefore must also have received them at least 14 days prior to their execution (the "FDD receipts"). [78, Exs. B-E].

Defendants filed a response to L.A. Insurance's supplemental brief [93], arguing that: (1) Montes actually signed the FDD receipts at the same time she signed the franchise agreements and that L.A. Insurance essentially back-dated her signature to reflect compliance with the applicable 14-day statutory waiting period; and (2) none of the provisions in the franchise agreements may bar defendants' counterclaims because the validity of those agreements are still at issue in this litigation. Defendants also reiterate that Montes allegedly signed at least some of the franchise agreements under duress and that the agreements are unenforceable because there is no mutuality of obligation between the parties.[4]

## II.    LEGAL STANDARD

Courts should freely grant leave to amend a complaint when justice so requires. *See* Fed. R. Civ. P. 15(a)(2). As the United States Supreme Court has held:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be "freely given."

---

[4] In their response to L.A. Insurance's supplemental brief which clearly argued that "Michigan does not recognize a breach of an implied covenant of good faith…" [78 at 11], defendants wrote: "Defendants have not made any argument [as to the obligation of good faith and fair dealing], and, therefore, do not wish to make any response at this time." [93 at 7]. This representation flatly undermines defendants' second counterclaim entitled "Breach of Covenant of Good Faith and Fair Dealing." [35, Ex. 1 at ¶¶ 69-73]. Since defendants have apparently abandoned this claim for relief, the Court considers it waived. *See Howe v. City of Akron*, 801 F.3d 718, 743 (6th Cir. 2015) (stating that waiver occurs when a party makes a "conscious choice to abandon a position"). Accordingly, to the extent defendants' motion sought permission to bring a claim for breach of covenant of good faith and fair dealing, it is denied.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, *Foman* "makes clear there are certain situations in which it is appropriate to deny leave to amend," including circumstances where amendment would be futile. *Harrison v. Burt*, No. 07-11412, 2008 U.S. Dist. LEXIS 66586, at *4 (E.D. Mich. Aug. 28, 2008).  An amendment is futile if it fails to state a claim upon which relief can be granted and would, thus, be subject to dismissal under Fed. R. Civ. P. 12(b)(6). *Id.* "Motions to amend should not be denied as futile when there are underlying, disputed issues of material fact because the court must accept the movant's allegations as true."  *Khoury v. Ford Motor Credit Co., LLC*, 2013 WL 6631471, at *6 (E.D. Mich. Dec. 17, 2013) (citing *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 382–83 (6th Cir.1993).

The federal rules further provide that, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).  As the plain language of the rule indicates, "supplemental pleadings, not amended pleadings, are intended to cover matters occurring after the original complaint was filed." *Harrison*, 2008 U.S. Dist. LEXIS 66586, at *2 (internal citations omitted).  The same standard of review that applies to amending a claim under Rule 15(a) also applies to supplementing a claim under Rule 15(d). *See Pasley v. Caruso*, No. 10-11805, 2012 U.S. Dist. LEXIS 38815, at *32-33 (E.D. Mich. Feb. 10, 2012) (stating that courts may deny a motion for leave to supplement that "would result in undue prejudice to the opposing party or if the supplemental complaint would be futile" or where the moving party exhibits undue delay, bad faith, dilative motive, or repeatedly fails to cure deficiencies that have been previously allowed by amendment).

### III.    ANALYSIS

#### A.    *Validity of the Franchise Agreements and Their Choice-of-Law Provisions*

L.A. Insurance advances a number of arguments in opposition to defendants' motions to amend and supplement that presuppose the validity of the franchise agreements and each of their provisions.   [*See e.g.*, 47 at 8, 14-15 ("Defendants [breach of contract and fiduciary duty counterclaims] are barred by the one-year statute of limitations in the franchise agreements"; "[Defendants' tortious interference counterclaims challenge] conduct that is expressly authorized by the franchise agreements"; "Defendants' proposed amended counterclaims (ECF #35-1) arise under the franchise agreements between the parties, which are governed by Michigan law"; and "Defendants' proposed Fifth Counterclaim [] and Third Supplemental Counterclaim [] for 'Deceptive Trade Practices under Nevada Revised Statute 598.0915 fail because these are claims brought under Nevada law, which is barred by the Michigan choice of law provision in the franchise agreements.")].

These arguments fail because they ignore defendants' allegations that: (1) the Revised Franchise Agreements were "adhesion contracts" which L.A. Insurance "foisted upon" them after placing them in duress; (2) L.A. Insurance fraudulently induced Montes into signing the various franchise agreements; (3) Montes was not provided the requisite 14-day notice period to review the franchise agreements prior to their execution; and (4) the Revised Franchise Agreements are unenforceable because they were not supported by consideration.   Should defendants eventually prove some or all of these contentions (whether under the laws of Michigan or Nevada, depending upon which one applies), the applicable franchise agreements could be rendered entirely unenforceable.   *See e.g.*, *Llewellyn-Jones v. Metro Property Group, LLC*, 22 F.Supp.3d 760, 786 (E.D. Mich. 2014) ("A party induced by fraud to enter into a

contract may elect to void the contract.") (citing *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich.App. 636, 639 (1995)); *Allard v. Allard*, 308 Mich. App. 536, 551-552 (2014) ("A contract may be deemed unenforceable if it was executed under duress."); *Buettner v. Buettner*, 89 Nev. 39, 45 (1973) ("as with all contracts, courts of this state shall retain power to refuse to enforce a particular antenuptial contract if it is found that it is unconscionable, obtained through fraud, misrepresentation, material nondisclosure or duress.").   Therefore, until L.A. Insurance establishes that defendants' allegations fail to state claims as a matter of law, it may not resort to the franchise agreements, or their choice-of-law provisions, as a basis for asserting that defendants' counterclaims are futile.

### 1.   Adhesion Contracts, Duress, Lack of Consideration, and Compliance with 14-Day Notice Requirement

In its supplemental brief [78 at 5-7], L.A. Insurance addresses defendants' allegations that the Revised Franchise Agreements are unenforceable "contracts of adhesion" that L.A. Insurance "foisted upon" them without offering any consideration, and after placing them in duress.  [35-1 at ¶¶ 29, 65; 77 at 21].  However, L.A. Insurance fails to adequately explain why these allegations cannot succeed as a matter of law.  Instead, L.A. Insurance simply asserts: (1) that defendants "fail to explain how any of the franchise agreements were "foisted upon" them; (2) Montes lied about only having 10 minutes to review and sign the contracts in question; and (3) defendants signed contracts for four different contracts over a five-year period of time. While defendants may face a significant uphill battle in terms of establishing the contracts' unenforceability due to these allegations, L.A. Insurance failed to establish that they cannot do so as a matter of law.

First, while the details at present are sparse, defendants did not "fail to explain" their assertion that at least certain of the agreements were "foisted upon them" or that were signed by

11

Montes "under duress." To the contrary, defendants allege that L.A. Insurance "forced" Montes to sign the Revised Franchise Agreements by "threatening … [to] take away all of [her] existing businesses" if she refused. [35-1 at ¶ 26]. The also allege that "[e]ven though the existing franchise agreement had yet to expire, [L.A. Insurance] offered no consideration for the substantially altered terms presented in the Revised Franchise Agreement." [*Id.* at ¶ 28]. And, at the hearing on this matter, Montes provided further clarifying details of her allegations:

> These contracts were signed under duress. They gave us ten minutes to sign [200-page contracts] or we would lose the agencies…Well, after about a year, about two years, don't quote me on the time frame, Your Honor, but a couple of years after I got the first agency and I build the business, they came to me and they say, "Well, it's time for you to buy us out. We're going to give you a loan to buy us out." I never received the loan. They just told me I have to give them payment of 9 percent interest and I had to come to Michigan to sign the contract. So I flew to Michigan, and within an hour they had me sign a bunch of pages. I didn't know what I was signing. There was a lot of stress. It was either that or I lose my agencies…It was exactly for me to buy them out. They were going to give me a loan of 9 percent, and if I bought them out, then I get to keep my agencies, and if I didn't, then I have to sell them to somebody else or -- or get out.

[77 at 21-23].

L.A. Insurance's second argument merely raises a factual question that the Court cannot decide at this stage of the litigation. L.A. Insurance insists that it provided Montes with a draft of each franchise agreement at least 14 days prior to her signing it, as required by law, and that "Montes lied to this Court [at the hearing] about only having '10 minutes' to sign the Franchise Agreements." [78 at 2]. At the hearing, the Court questioned L.A. Insurance's counsel about this matter:

> THE COURT [to L.A. Insurance's counsel]: either you have an e-mail that's dated 14 days before the meeting that shows that, "Here, ma'am, we're providing you with this document" [thus satisfying the 14-day requirement][5]…But if she's right and -- and she was called there in violation

---

[5] Given the voluminous nature of the franchise agreements, the Court simply assumed, for the

of the statute and presented with a document in violation of the 14 days, then maybe she has an argument [as to the agreements' enforceability].

MR. FUHS: Your Honor, with all due respect, she signed the original agreements, was never an issue with that.  She signed the second round of agreements.   She signed the acknowledgements that she read and understood.

* * *

THE COURT: And that might be enough for you to win, but if your client did not comply with the 14-day notice –

MR. FUHS: There's no evidence that we did not, Your Honor.

THE COURT: I understand, but there's -- there's no evidence that you did either at this point.  And -- and as I was saying, I just think that if -- if you were asking me to shut down her -- her business and her life essentially -- which I will do if that's what I'm required to do.  If that's what the facts and the law shows is the right answer, then, you know, so be it, I don't have a problem with that.  But, you know, you're -- you're not listening to my question.  I -- I understand she signed it and I understand she's a business person.  That to me isn't the issue…what I'm saying is that if it turns out that your client violated a 14-day [] advance notice period, [] I don't know what the law says about how that interacts with somebody that, yes, [] signed it [but claims the failure to provide the 14 days' notice invalidates the agreement]

MR. FUHS: … I just don't understand how we can prove a negative essentially.

THE COURT: By showing me an e-mail dated 14 days before the meeting that shows that she was sent the document [in compliance with the law].

[77 at 26-28].

In the supplemental brief it filed after the hearing, L.A. Insurance points the Court to the signature pages of the various Financial Disclosure Document "Receipts," each of which purports to be signed by Montes approximately two weeks before she signed the respective

---

sake of discussion, that it might have satisfied the 14-day notice requirement by e-mailing Montes a copy of the draft documents she was to sign.  At this point, however, the Court is unaware of *how* L.A. Insurance claims to have provided the drafts to Montes.

franchise agreements.  [78, Exs. B-E].  L.A. Insurance thus contends that the Receipts prove that Montes "received a copy of the [] relevant Franchise Agreement [she was being asked to sign], well before [she] signed the agreements themselves," and that she lied to the Court about not receiving them in advance.  [*Id.* at 3].  While the inference L.A. Insurance asks the Court to draw from the exhibits is a reasonable one – indeed the most reasonable one – the problem is that Montes unequivocally asserts that she "did not receive the Franchise Disclosure Documents fourteen (14) days before [she] signed the Franchise Agreements," apparently implying that the signature pages were backdated.  [80 at ¶ 40; *id.*, at ¶¶ 39, 41-43].

Because the Court is merely considering whether defendants' proposed amendments would be futile, it must accept their factual averments as true.  Accordingly, at least at the present time, it cannot find, as L.A. Insurance asks it to do, that Montes has lied about these matters.  Consequently, the Court also cannot say whether L.A. Insurance complied with the 14-day requirement, and the parties did not brief the issue of the agreements' enforceability if in fact L.A. Insurance did not comply with that requirement.  In short, L.A. Insurance's assertion that Montes lied about not receiving the draft agreements in advance is not a basis for denying her instant motions.

Finally, while L.A. Insurance's argument that defendants signed contracts for four different contracts over a five-year period of time would seem to go a long way toward disproving many of Montes' factual assertions and theories, this is simply some of the relevant evidence that will need to be sorted out through discovery before the Court can determine whether any material questions of fact exist that would make a trial necessary.

Accordingly, at least at this stage of the litigation, the Court must reject L.A. Insurance's argument that defendants' proposed counterclaims for fraud, constructive fraud, breach of

contract, tortious interference with business relations, tortious interference with contractual relations, and violations of Nevada Revised Statutes 598.0915, all fail pursuant to the terms of various franchise agreements.

### 2.    Fraud

Because defendants' fraud claims (Counts IV and XIII) are fairly central to its case, the Court also addresses here L.A. Insurance's argument that these claims "would not survive a motion to dismiss because [they] are barred by the integration clauses of the parties' franchise agreements." [47 at 17]. While L.A. Insurance quoted the franchise agreements' integration clause in its initial response brief, it did not cite a single case which actually analyzed how such a clause impacts an opposing party's claim that it was fraudulently induced to execute the underlying agreement; indeed, L.A. Insurance did not cite any case law whatsoever in support of its argument. [*Id.* at 17-19]. Accordingly, at the hearing, the Court asked L.A. Insurance whether it could point the Court to any case law that supported its position on this issue.

L.A. Insurance then filed its supplemental brief, writing:

> An integration or merger clause may nullify antecedent claims, including claims relating to formation problems. *Dedvukaj v. Equilon Enters, LLC*, 301 F. Supp. 2d 664, 670 (E.D. Mich. 2004), aff'd, No 04-1284, 2005 U.S. App. LEXIS 8408 (6th Cir. May 11, 2005). Indeed, Michigan courts have interpreted integration clauses to be an effective defense against claims of fraud. *See UAW-GM Human Res Ctr v. KSL Recreation Corp*, 228 Mich. App. 486, 579 N.W.2d 411 (1998). If a contract contains a merger clause, it may still be avoided based on fraud, but only where the fraud related to the merger clause or invalidated the entire agreement, including the merger clause. *Id.*

[78 at 4].

These three sentences only scratch the surface of this area of the law, and fail to demonstrate that Montes' fraud claims are futile as a matter of law. The case of *Llewellyn-Jones*, 22 F.Supp.3d at 784-85, while not involving a franchise dispute, illuminates why this is so. In

15

*Llewellyn-Jones*, the plaintiffs were real estate investors who alleged that they were fraudulently induced into investing in certain rental properties about which the owner had made various false representations, including that the units had been refurbished, were tenanted, and had received a federal housing program approval.  After the investments went bad, the plaintiffs sued, alleging, among other claims, that they had been fraudulently induced into making the investments.  The defendants moved to dismiss, arguing that the purchase agreement's merger clause stated that "This Agreement sets forth the entire agreement between the parties…"  The purchase agreement also indicated that the real estate in question was being sold "in As Is Condition."  In rejecting the defendants' argument that these contractual provisions doomed the investors' fraud claims, the district court explained:

> There is some support for the idea that a merger and integration clause renders reliance on pre-contract representations unreasonable per se [thus dooming a fraud claim based on those representations]… In *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir.2001), the court read Ohio law to hold that "[i]f a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution."  But Michigan courts do not take the point so far.  For instance, in *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 646 N.W.2d 170 (2002), the Michigan Supreme Court held that although "an integration clause nullifies all antecedent agreements," that rule is "[s]ubject ... to evidence of certain kinds of fraud (or other grounds sufficient to set aside a contract) and for the rare situation when the written document is obviously incomplete on its face." *Id.* at 413, 414 n. 15, 646 N.W.2d at 177 & n. 15 (internal quotations and citations omitted); *see also UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 503, 579 N.W.2d 411, 419 (1998) (holding that "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause" (quoting 3 Corbin, Contracts, § 578)).

> This case, then, is governed by the rule that the presence of a merger clause in a written contract will not preclude a claim for fraud in the inducement where the plaintiff can show that it would have avoided the agreement entirely had it known that the defendant's fraudulent representations in fact were false. *Custom Data Solutions, Inc. v. Preferred Capital*, *785 Inc., 274

Mich.App. 239, 243, 733 N.W.2d 102, 105 (2006) (observing that "[d]espite the existence of a merger clause, parol evidence is admissible for purposes of demonstrating that the agreement is void or voidable or for proving an action for deceit. Fraus omnia corrumpit: fraud vitiates everything it touches" (quoting Calamari & Perillo, The Law of Contracts § 9.21, at 340–41 (4th ed.))). As the Sixth Circuit has explained:

> [T]here is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation. It stretches the [*KSL Recreation*] holding too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract.

*LIAC, Inc. v. Founders Ins. Co.*, 222 Fed.Appx. 488, 493 (6th Cir.2007) (quoting *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F.Supp.2d 927, 929–30 (E.D. Mich. 2005)) (alterations in original).

*Star Ins. Co.*, 392 F.Supp.2d at 929-30 (emphasis added), in turn, held that:

> The key element in cases involving a merger clause is whether one justifiably relied on the representations of another when the parties' written agreement clearly stated that by signing the document they were agreeing that the document made up the parties' entire agreement regarding the terms of the contract and its performance standards. The Michigan courts have said that, as it pertains to representations regarding additional agreements or contractual terms, a party would not be justified in relying on them where there is a merger clause. The reasoning behind this is clear, one should not be heard to complain that they relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary. Yet, a party could still justifiably rely upon representations made by another party regarding things outside the scope of the contractual terms, such as ***the other party's*** solvency, indebtedness, ***experience***, ***clientele***, ***client retention rate***, ***business structure***, etc. If these representations are false when they are made, not merely opinion and not future promises, they could constitute fraud in the inducement.

Here, while L.A. Insurance is right to question how Montes could have justifiably relied on at least some of the alleged fraudulent misrepresentations with respect to her execution of the later franchise agreements, this is a factual matter that the Court cannot conclusively determine

17

at this stage of the litigation.  What is relevant at this stage is that defendants allege that L.A. Insurance fraudulently induced Montes to execute the franchise agreements by falsely asserting that it "had negotiated better than market commission rates with insurance carriers," "had dozens of authorized carriers," and had "an aggressive marketing and advertising arm" and "a comprehensive system of support and assistance," knowing these assertions were untrue.  [35-1 at ¶ 82].[6]  These alleged fraudulent misrepresentations are not ones which attempt to alter the franchise agreements' terms, but rather are allegedly false "representations of fact made by [L.A. Insurance] to [Montes] to induce [her] to enter into a contract," which could conceivably "invalidate[] the entire contract."  *LIAC*, 222 F. App'x at 493.  Thus, the mere fact that the franchise agreements contain a merger clause does not necessarily doom defendants' fraud claims.

B.      *Mich. Comp. Laws § 445.903*

L.A Insurance is correct that even if Michigan law is controlling in this case, defendants' counterclaim under Mich. Comp. Laws § 445.903 lacks merit and must be dismissed.  Section 445.903(1) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" and provides a laundry list of examples. *See* Mich. Comp. Laws § 445.903 (a) - (kk).  Specifically exempted from the term "trade or commerce" is "the purchase

---

[6] To the extent defendants allege that L.A. Insurance falsely represented that it "would be adding over a hundred authorized carriers to its approved list," and "would provide comprehensive marketing support in the Southern Nevada market" going forward, [*id.* at ¶¶ 84, 86], such forward-looking statements cannot support their fraud claim. *Cook v. Little Caeser Enterprises, Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) ("To establish fraud, the allegedly false statements must relate to past or existing facts, not to future promises or expectations."); *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976) ("an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact.  Future promises are contractual and do not constitute fraud.").

18

or sale of a franchise," so long as the franchisor is not engaged in "pyramid and chain promotions . . . as defined in the franchise investment law." Mich. Comp. Laws § 445.902(g).

Under the Franchise Investment Law, a pyramid or chain promotion is defined as:

> any plan or scheme or device by which (a) a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program or (b) a participant is to receive compensation when a person introduced by the participant introduces one or more additional persons into participation in the plan, each of whom receives the same or similar right, privilege, license, chance, or opportunity.

Mich. Comp. Laws § 445.1528. Based on a review of defendants' proposed first amended counterclaims and first supplement to its counterclaims [35, Ex. A; 36 Ex. A], L.A. Insurance is clearly exempt from liability under Mich. Comp. Laws § 445.903 because its alleged conduct does not remotely resemble a "pyramid or chain promotion" as those terms are defined in the Franchise Investment Law. Moreover, defendants' cursory assertion that "[p]laintiff can be held liable under the MCPA if its franchise includes a pyramid or chain promotion" is so devoid of any meaningful analysis that it cannot possibly salvage this counterclaim. [50 at 9]. Thus, defendants' are not entitled to relief under Mich. Comp. Laws § 445.903, and defendants' instant motions are denied to the extent they attempt to plead claims for relief under this statute.

C.   *Fiduciary Duty*

L.A. Insurance contends that, as a matter of law, "franchise agreements do not give rise to fiduciary or confidential relationships between the parties." [47 at 25]. This argument fails regardless of whether Michigan or Nevada governs this litigation.[7]

---

[7] L.A. Insurance also contends that defendants' counterclaim for breach of fiduciary duty is futile in view of the franchise agreements' provisions disclaiming such a relationship, and those which supposedly permit the very conduct defendants maintain is a breach of L.A. Insurance's fiduciary obligations. As discussed above, however, at least at this time, when the agreements' validity remains an open issue in the case, L.A. Insurance may not rely upon the agreements'

Under Michigan law, a "fiduciary relationship is used to broadly describe relationships of inequality." *In re Estate of Ostrowski*, 2010 WL 5373828, at *4 (Mich. Ct. App. Dec. 28, 2010). Such relationships arise "when one reposes faith, confidence, and trust in another's judgment and advice." *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 515 (1981). "Thus, a fiduciary relationship may exist where one party exercises complete dominion over the other party or where one party has placed complete trust in the other party who has the requisite knowledge, resources, power, or moral authority to control the subject matter at issue." *Estate of Ostrowski*, 2010 WL 5373828, at *4. An entity that is "in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation." *Bero Motors v. GMC*, No. 224190, 2001 Mich. App. LEXIS 2029, at *12 (Mich. Ct. App. Oct. 2, 2001). While Michigan courts are usually "reluctant to extend the cause of action for breach of fiduciary relationship beyond the traditional context," *id.*, they acknowledge that deciding whether such a relationship exists is a fact specific determination that depends upon the nature of the relationship in any given context. *Id.* at *11; *see also Muglia v. Kaumagraph Corp.*, Nos. 93-1986, 94-1156, 1995 U.S. App. LEXIS 24400, at *14 (6th Cir. Aug. 16, 1995) ("[e]xcept for certain *per se* fiduciary relationships, such as that between an attorney and client, fiduciary relationships arise from the facts and circumstances surrounding the relationship between the parties."). Ultimately, "[w]here a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial." *Fassihi*, 107 Mich. App. at 515 (citing *Smith v. Saginaw Savings & Loan Ass'n*, 94 Mich. App. 263, 274 (1979).

---

terms to defeat defendants' counterclaims.

For instance, in *AKB Wireless, Inc. v. Wireless Toyz Franchise, LLC*, No. 14-13424, 2015 U.S. Dist. LEXIS 167194 (E.D. Mich. Dec. 15, 2015), the district court rejected an argument much like the one urged by L.A. Insurance in the instant case. There, the franchisor argued "as a matter of law, that relationships between franchisees and franchisors do not give rise to fiduciary or confidential relationships between the parties." *Id.* at \*19. But the district court disagreed, and held that the franchisee adequately pled a breach of fiduciary duty claim because it alleged that the franchisor had obtained commissions from third-party carriers and held them in a trust account on behalf of the franchisee. *Id.* at \*20.

Another example (albeit in the context of a non-franchise business dispute) is *Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*, No. 03-55, 2004 U.S. Dist. LEXIS 18965 (W.D. Mich. Mar. 30, 2004). In *Riverside*, a group of automobile dealerships executed an agreement with an extended warranty administrator to "sell [e]xtended [w]arranties to customers in conjunction with automobile sales." *Id.* at \*2. As a part of their arrangement, the administrator assisted the dealerships in forming a reinsurance company with the intention that it would provide the dealerships with additional revenue. *Id.* at \*2-3. Eventually the dealerships sued the administrator for, among other things, breach of fiduciary duty because it allegedly "misrepresented the amount of money that would reach [the dealerships] through the reinsurance agreement." *Id.* at \*4. According to the dealerships, the administrator assumed a fiduciary duty because:

> it acted in the capacity of promoter, director, and manager in setting up and facilitating the incorporation of [the reinsurance company] and managing its relationship with [a third-party insurance carrier]. The [dealerships further] allege[d] that as automobile dealers without any experience in the insurance business, they personally took on risks and committed their assets to the reinsurance program based on promises of a steady stream of profits that could be used to fund, for example, retirement or college education . . . Meanwhile, [the administrator] allegedly handled

> all aspects of the formation and subsequent operations of [the reinsurance company], to include incorporating it in the Turks and Caicos Islands; making all necessary regulatory filings and communications; getting licenses; handling tax matters; and distributing shares of stock. Also, [the dealerships] contend[ed] that [the administrator] maintained a fiduciary relationship with [them] regarding the Extended Warranty arrangement by managing the sales business; providing all forms, brochures, and supplies; keeping records of all sales; administering the handling of claims; authorizing the performance of covered repairs; reimbursing the dealer for repairs; offering consulting services; and conducting training for dealer sales personnel.

Id. at *21-22.  The administrator moved to dismiss the breach of fiduciary duty claim on the ground that it had merely shared an arms-length business relation with the dealerships and nothing more.  The district court concluded otherwise.  Acknowledging numerous authorities that "make clear that in most circumstances, business entities dealing with one another in a commercial setting do not incur fiduciary duties, even when their relationships involve a measure of trust or confidence," *id.* at 30,  the court nevertheless ruled that the dealerships sufficiently alleged "substantial imbalances of knowledge, power, and capability between themselves and [the administrator]." *Id.* at *31.  As a result, the court held that it was "unable to decide at this stage whether the relationship between [the dealerships] and [the administrator] took on a fiduciary character." *Id.* at *20.

Although *AKB* and *Riverside* are somewhat factually distinguishable from the present case, their principal holdings apply with equal force here.  Defendants allege that "the extraordinary lopsided nature of the Revised Franchise Agreement[s], coupled with the Plaintiffs ongoing promises of support, guidance and fair treatment, gave rise to a clear fiduciary duty." [35, Ex. A at ¶ 112].  Defendants maintain that this disproportionate power is evidenced, for example, by L.A. Insurance allegedly invoking the terms of the Revised Franchise Agreements to justify placing Toro NV6 "just across the street from NV26 insurance," which significantly

22

diminished NV26's sales revenue. [35-1 at ¶¶ 45-46].   Similarly, defendants point to L.A. Insurance's asserted right under the Revised Franchise Agreements to instruct third-party insurance carriers to forward defendants' commissions to L.A. Insurance's corporate office. [36-1 at ¶ 25].   Taken together, these allegations at least plausibly show that L.A. Insurance completely dominated the business relationship between it and the defendants, and could essentially unilaterally control defendants' ability not just to succeed in business, but to succeed as one of its franchisees.

Again, at least at this stage of the litigation, where discovery has yet to commence, and in view of all of the foregoing, it would be premature for the Court to decide that, as a matter of law L.A. Insurance and the defendants were not in a fiduciary relationship.  *See Riverside*, 2004 U.S. Dist. LEXIS 18965, at *31 (finding no "authority requiring a fact-finder to conclude from Plaintiffs' allegations that no fiduciary relationship existed."); *Bero Motors*, 2001 Mich. App. LEXIS 2029, at *11 ("whether a fiduciary relation exists is a question of fact."); *Fassihi*, 107 Mich. App. at 515 ("Based upon the pleadings, we cannot say that plaintiff's [breach of fiduciary duty] claim is clearly unenforceable as a matter of law.").[8]

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion for leave to amend counterclaims **[35]** is **GRANTED IN PART** and **DENIED IN PART** and defendants' motion for leave to supplement counterclaims **[36]** is **GRANTED IN PART** and **DENIED IN PART**.   Defendants' may proceed with all of their amended and supplemental counterclaims other than those seeking relief under the covenant of good faith and fair dealing and Mich. Comp. Laws § 445.903.

---

[8] The same may also be said under Nevada law, which (if it were to apply) recognizes that franchise agreements can and do give rise to "a special element of reliance or fiduciary duty." *Great Am. Ins. Co. v. General Builders, Inc.*, 113 Nev. 346, 354 (1997).

23

Dated: March 11, 2016                    s/David R. Grand
Ann Arbor, Michigan                      DAVID R. GRAND
                                         United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 11, 2016.

                                         s/Eddrey O. Butts
                                         EDDREY O. BUTTS
                                         Case Manager